**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, COUNCIL 214, AFL–CIO, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

No. 86–1631.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1987.

Decided Dec. 29, 1987.

Charles A. Hobbie, with whom Mark D. Roth, Washington, D.C., was on the brief, for petitioner.

William E. Persina, Deputy Sol., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol. and Pamela P. Johnson, Atty., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent.

Before BUCKLEY and WILLIAMS, Circuit Judges, and AUBREY E. ROBINSON, Jr.,* Chief Judge, United States District Court for the District of Columbia.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge WILLIAMS.

BUCKLEY, Circuit Judge:

This is a petition for review of a decision of the Federal Labor Relations Authority holding that an employer could reduce remittances to a union of dues withheld from employees in order to compensate for over-

* Sitting by designation pursuant to 28 U.S.C.

payments previously made by the employer to the union. We reverse.

## I. BACKGROUND

Pursuant to 5 U.S.C. § 7115(a), management officials at Kelly Air Force Base in San Antonio, Texas deducted union dues from salaries of employees who had executed assignments authorizing the deductions. The deducted amounts were then remitted in a single check to the union (American Federation of Government Employees ("AFGE") Local 1617, an affiliate of AFGE Council 214). The parties agree that the statute does not permit such deductions with respect to supervisory employees. *See* 5 U.S.C. §§ 7103(a)(2), 7112(b), 7115(b). In some instances, however, management continued to deduct union dues from employees for a short time following their promotion to supervisory positions. When the error was discovered, management reimbursed these employees, and deducted the amounts from the remittance to the union of dues withheld from other employees in a subsequent period.

The union challenged the deductions as an unfair labor practice in a proceeding before the Federal Labor Relations Authority ("FLRA" or "Authority"). The union relied on the rulings of two courts of appeals that the employer lacked statutory authority to reduce remittances to compensate for similar errors. *American Fed'n of Gov't Employees, Local 2612 v. FLRA*, 739 F.2d 87 (2d Cir.1984) ("*Griffiss*"); *American Fed'n of Gov't Employees, Local 1816 v. FLRA*, 715 F.2d 224 (5th Cir. 1983) ("*Goodfellow*"). Nevertheless, both the administrative law judge who initially heard the case and the FLRA held that management had acted properly. The FLRA did not attempt to distinguish the previous cases but disagreed with their reasoning and declined to follow them.

## II. DISCUSSION

### A. Statutory Issue

#### 1. *Standard of Review*

We review the FLRA's decision under the abuse of discretion standard. 5 U.S.C.

§ 292(a).

§ 7123(c); 5 U.S.C. § 706. The FLRA "is entitled to considerable deference when it exercises its 'special function of applying the general provisions of the Act to the complexities' of federal labor relations." *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) ("*BATF*") (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963)). We may not defer, however, to an administrative decision that is inconsistent with the plain language of a statute. *BATF*, 464 U.S. at 97, 104 S.Ct. at 444 (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988–89, 13 L.Ed.2d 839 (1965)); *see also* 464 U.S. at 98 n. 8, 104 S.Ct. at 444 n. 8. "If the statute is clear and unambiguous 'that is the end of the matter[;] for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986) (quoting *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)); *see also* 474 U.S. at 373–75, 106 S.Ct. at 688–89.

### 2. *Statutory Language*

■ 5 U.S.C. § 7115(a) provides:

If an agency has received from an employee in an appropriate unit a written assignment which authorizes the agency to deduct from the pay of the employee amounts for the payment of regular and periodic dues of the exclusive representative of the unit, the agency shall honor the assignment and make an appropriate allotment pursuant to the assignment.

We interpret this section as imposing an absolute duty on the employer to turn over to the union all funds deducted.

The FLRA argues that the funds erroneously withheld and remitted to the union constitute monies that the union wrongfully obtained, and which the union was obliged to repay. The Authority characterizes the deducted dues as union property, against which the employer can set off the union's debt.

Even if we were to agree with the FLRA that a set-off is appropriate in this situation, we do not agree that the withheld dues are union property until they are actually delivered to the union. *Cf. Goodfellow*, 715 F.2d at 228 (withheld dues property of employees until delivered to union). The statute clearly was designed for the primary benefit and convenience of the employee. The employee has the right to decide whether to opt for withholding and to control the disposition of the funds so withheld. The employer acts as the agent of the employee with respect to the withheld funds. In the words of the statute, the employer "shall honor the assignment." 5 U.S.C. § 7115(a). We agree with the Second Circuit that "shall honor" indicates "a mandatory intent"; the employer's obligation to honor the dues check-off is "nondiscretionary." *Griffiss*, 739 F.2d at 89.

We are aided in this conclusion by the inclusion of the word "allotment" in 5 U.S.C. § 7115(a). To allot is to "set apart specific property ... to a distinct party." *Black's Law Dictionary* 70 (5th ed. 1979). An allotment therefore is an apportionment of an identifiable *res* to the person entitled to the property by law or contract. Under section 7115, the employer is authorized only to allot, not to set off. The statute does not contemplate the creditor's remedy utilized here.

We find a helpful analogy in 5 C.F.R. § 550.312(e), which provides: "Allotters shall agree that disputes regarding any authorized allotment shall be a matter between the allotter [employee] and the allottee [union]." The employer is viewed as a neutral and passive intermediary between the employee and the union. Although this regulation appears to apply primarily to disputes between the employee and the union concerning the amount of dues owed, it also indicates that the employer is properly viewed as performing the passive and ministerial function of turning over employee's dues to the union. *Cf. Griffiss*, 739 F.2d at 89–90.

The FLRA relies on cases that hold, in different factual and legal contexts, that "assignments" operate as conveyances to

the assignee upon their execution. *See, e.g., Seaboard Small Loan Corp. v. Ottinger,* 50 F.2d 856, 857 (4th Cir.1931); *Moutsopoulos v. American Mutual Ins. Co.,* 607 F.2d 1185, 1189 (7th Cir.1979). It therefore follows, says the Authority, that at the moment monies are withheld from the employee's wages for payment of union dues, they become the union's property. The FLRA points to private labor law cases that support this position. *See, e.g., English v. Cunningham,* 269 F.2d 517, 539 (D.C.Cir.) (employer who withholds dues under checkoff system is agent of union), *cert. denied,* 361 U.S. 897, 905, 80 S.Ct. 195, 4 L.Ed.2d 152, 181 (1959); *Bassick Co. v. Bassick Local 229,* 126 F.Supp. 777, 779 (D.Conn.1954); *Kidde & Co. v. United Electrical, Radio & Machine Workers of America,* 7 N.J. 528, 82 A.2d 184 (1951).

The FLRA overlooks a critical distinction between these private labor cases and the case at bar. When a union and an employer negotiate a dues check-off, as in the cases cited by the Authority, the courts rightly conclude that the employer acts primarily for the benefit of the union. As the dues check-off was obtained by the union, the withholding employer acts as the union's agent. Indeed, the cases relied upon by the FLRA are premised specifically on the contractual relationship between the union and the employer. *See, e.g., West Virginia Pulp & Paper Co. v. Lewis,* 17 Misc.2d 94, 191 N.Y.S.2d 303, 307 (Sup.Ct. 1958), *aff'd mem.,* 8 A.D.2d 899, 187 N.Y.S. 2d 1002 (1959). Here, however, the withholding is authorized by statute and is made at the explicit request of the employee. The union has no role in negotiating the checkoffs, and the withholding employer acts solely as the employee's agent.

We previously have cautioned against an inappropriate reliance on private labor precedents in litigation concerning the Federal Labor Relations Act ("Act"). As we recognized in *Library of Congress v. FLRA,* 699 F.2d 1280, 1287 (D.C.Cir.1983), labor-management relations in the public and private sectors are "determined by different statutory provisions and by different policy considerations." Thus, private labor cases are relevant *only* when they involve statutory provisions and policy considerations comparable to those governing labor relations under the Act. *See National Treasury Employees Union v. FLRA,* 826 F.2d 114, 122 (D.C.Cir.1987). The dues withholding provision of the Act, 5 U.S.C. § 7115, has no counterpart in the National Labor Relations Act or the Labor Management Relations Act. In private cases, dues withholding is a matter reserved for collective bargaining. *See United States Gypsum Co.,* 94 N.L.R.B. 112, 113 n. 7, *amended,* 97 N.L.R.B. 889 (1951), *mod.,* 206 F.2d 410 (5th Cir.1953), *cert. denied,* 347 U.S. 912, 74 S.Ct. 475, 98 L.Ed. 1068 (1954); 2 *The Developing Labor Law* 1406 (Morris ed. 1983). We therefore find the FLRA's reliance on private labor precedents misplaced.

The dissent relies on *Lodge 2424, Int'l Ass'n of Machinists & Aerospace Workers v. United States,* 564 F.2d 66, 215 Ct.Cl. 125 (1977), for the proposition that the government may recoup monies erroneously transmitted to the union by reducing the remittance in a later period. But in *Lodge 2424,* the government employer was specifically authorized by regulation to adjust remittances to the union in a subsequent period to correct for amounts erroneously withheld previously. 564 F.2d at 71. No similar authority obtains here. *Lodge 2424* buttresses its conclusion by referring to cases such as *United States v. Munsey Trust Co.,* 332 U.S. 234, 239–40, 67 S.Ct. 1599, 1601–02, 91 L.Ed. 2022 (1947), which indicate that the government can reduce its obligations under a *contract* through a set-off. Although these cases were relevant in *Lodge 2424,* which involved the interpretation of a collective bargaining agreement, they are not helpful in this case, which concerns a statutory, not a contractual relationship.

Finally, we are not persuaded by the Authority's claim that the statutory requirement that the employer remit an "appropriate" amount permits the employer to reduce its allotment to the union. The statutory duty to remit an "appropriate" amount does not give the employer unfettered discretion to remit as much as it sees

fit. The employer must remit an "appropriate" amount, but the amount that is appropriate is the amount that the employer properly withheld from employees who executed valid check-offs.

■ The employer's error in withholding and remitting dues from supervisory employees does not permit it to compound the error by reducing the allotment it is obliged to make. Even though the union receives the same sum as it was entitled to receive, the employees have suffered the conversion by the employer of wages they still own.

We do not decide whether the employer could recover the amounts improperly withheld from supervisory employees and remitted to the union in a separate action brought against the union. *Cf. Griffiss,* 739 F.2d at 90 n. 1.

### B. Rights Under Master Labor Agreement

Because we hold that the withheld funds are the property of the employees, we find it unnecessary to remand for a determination concerning the parties' rights under the Master Labor Agreement. Section 8.08 of the Agreement provides:

> Deductions will not be made for an employee who has been in a nonpay status for a pay period. Administrative errors in remittance checks and/or improper deductions will be corrected by the Employer and adjusted in the next remittance check to be issued to the Union local. If the Union local is not scheduled to receive a remittance check after discovery of the error, the Union agrees to promptly refund the amount of the erroneous remittance.

Even if this provision were construed as applying to the withholding error committed here, an issue on which we do not pass, the contract between the union and the employer cannot alter the property rights of the employees in their wages. These rights, as we have held, are not extinguished until the withheld dues are delivered to the union.

### C. Collateral Estoppel

Petitioner asserts that the interpretation of the statute advanced by the FLRA was fully litigated and twice rejected by federal appellate courts. Petitioner claims that because the FLRA has had a full opportunity to convince two courts of its position, it is collaterally estopped to present these views to us.

■ *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), held that the rules governing offensive issue preclusion between private litigants do not apply when the government is a party. Collateral estoppel will apply against the government only if mutuality of parties exists. *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). In *Stauffer,* the EPA sought to inspect one of Stauffer's plants in Wyoming using private contractors. The Tenth Circuit ultimately held that the EPA lacked authority to employ private parties in this fashion. Meanwhile, the EPA attempted to inspect another of Stauffer's plants in Tennessee, again with private contractors. The Supreme Court held that the EPA was estopped to claim it was authorized to use private contractors to inspect the Tennessee plant. Because the parties were the same in both actions, Stauffer was permitted to invoke defensive collateral estoppel.

In this case, the previous adjudications of the statutory issue involved different locals of the same union. An adjudication against one local does not necessarily bind the parent union, and *a fortiori* does not bind other locals. *See, e.g., Carbon Fuel Co. v. United Mine Workers of America,* 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979) (parent union cannot be held liable for actions of local unless authorized).

■ Mutuality may obtain if the parent union controlled the previous litigation. One who controls litigation, even if not named as a party, may be subject to collateral estoppel. *See Montana v. United States,* 440 U.S. 147, 153–55, 99 S.Ct. 970, 973–75, 59 L.Ed.2d 210 (1979). *Montana* held that the U.S. was bound by a previous adjudication even though it had not been a

party: the government had required the previous lawsuit to be filed, reviewed and approved the complaint, financed the litigation, directed the appeal, and submitted an *amicus* brief. *Id.*

In *American Postal Workers Union v. United States Postal Service*, 736 F.2d 317, 318–19 (6th Cir.1984), a local of a national union sought to enjoin the Postal Service from disciplining workers for absences due to use of sick leave. The Postal Service sought dismissal, arguing that the union's claim was *res judicata.* The Postal Service pointed to another case filed by another local of the same union. The court disagreed. The parties were not identical in the two suits, and there was no showing of privity between the two locals. The fact that both locals were under the auspices of a national union was insufficient in itself to establish privity, as the national union was not a party. The court implied, however, that *res judicata* would apply if the national had been as involved in both cases as a co-party would have been. 736 F.2d at 319.

Petitioner failed to present evidence in the administrative proceeding demonstrating that the parent union controlled both the previous and the instant litigation. The only evidence before us on this issue is the overlap of counsel in *Griffiss, Goodfellow,* and this case. But commonality of counsel, standing alone, is insufficient to establish mutuality. "We know of no basis for holding that the mere fact that the same attorney represented the parties in another action that has gone to

judgment makes the latter *res adjudicata* against his client." *Ramey v. Rockefeller,* 348 F.Supp. 780, 785 (E.D.N.Y.1972) (three-judge court); *see also Garza v. Henderson,* 779 F.2d 390, 393–94 (7th Cir.1985); *Freeman v. Lester Coggins Trucking, Inc.,* 771 F.2d 860, 864 (5th Cir.1985). The inference of mutuality is particularly weak here, as there is no evidence that common counsel initiated each case.

As petitioner had the burden of proving *res judicata,* the absence of evidence in the record establishing mutuality requires us to reject the collateral estoppel claim.

### III. CONCLUSION

The petition for review is granted, and the decision of the FLRA is reversed.

*So ordered.*

WILLIAMS, Circuit Judge, dissenting:

The controlling provision of law, 5 U.S.C. § 7115 (1982),[1] part of the Federal Service Labor–Management Relations Statute, 5 U.S.C. § 7101 *et seq.* (1982), authorizes a government agency to withhold part of an employee's salary to pay dues to the exclusive representative of the employee's bargaining unit (so long as the employee has agreed to the check-off). It is agreed by both parties that this authority ceases when an employee is promoted to a supervisory position and therefore stops being a member of the bargaining unit.[2]

The only point at issue is what the agency may do when it discovers that it has

---

1. Sections 7115(a) & (b) provide:
   (a) If an agency has received from an employee in an appropriate unit a written assignment which authorizes the agency to deduct from the pay of the employee amounts for the payment of regular and periodic dues of the exclusive representative of the unit, the agency shall honor the assignment and make an appropriate allotment pursuant to the assignment. Any such allotment shall be made at no cost to the exclusive representative or the employee. Except as provided under subsection (b) of this section, any such assignment may not be revoked for a period of 1 year.
   (b) An allotment under subsection (a) of this section for the deduction of dues with respect to any employee shall terminate when—

   (1) the agreement between the agency and the exclusive representative involved ceases to be applicable to the employee; or
   (2) the employee is suspended or expelled from membership in the exclusive representative.

2. Section 7103(a)(2) excludes supervisors from the definition of employees, and § 7112(b) states that a bargaining unit shall not be determined to be appropriate if it includes a supervisor. Thus on promotion to a supervisory position an employee necessarily ceases to be covered by the agreement between the agency and the exclusive representative; accordingly, under § 7115(b) the allotment must "terminate."

withheld wages due a promoted employee and paid them over to the union in violation of § 7115. The agency claims that it may recoup such overpayments from funds that it thereafter segregates from current employees' wages for payment of union dues. The Federal Labor Relations Authority, vested by statute with the tasks of construing the statute and of overseeing federal government labor relations, has agreed. The union contends that such recoupment violates § 7115 and therefore constitutes an unfair labor practice under 5 U.S.C. § 7116(a)(1), (5) and (8) (1982).

Because the agency's recoupment approach gives the union and present and past members of the bargaining unit precisely what the statute affords them, no more and no less, I can find no illegality and no unfair labor practice.

There appears to be no dispute that the agency's policy gives the union and promoted members of the unit precisely what § 7115 says they should receive. (1) The union collects in full, through the check-off system, all dues for every assigning employee, for the entire period during which the employee was a member of the bargaining unit. If the promoted employee remains a member of the union (as he or she may despite elevation from the bargaining unit), the union may secure that employee's dues by all lawful means. These do not include check-off; the statute, as everyone agrees, does not allow check-off as to such a promoted member. (2) Promoted members receive just what the statute affords them: check-off for all periods when they were members of the bargaining unit, no check-off thereafter.

The sole controversy revolves around the effect on the rights of current bargaining unit members. Two courts of appeal have found the government's recoupment procedure to violate those rights. In *AFGE Local 2612 v. FLRA*, 739 F.2d 87 (2d Cir. 1984), the court found the recoupment to infringe on such employees' "right to expect that the money [deducted from their wages] would be used for [the] purpose of [paying their dues]." *Id.* at 90. To similar

effect is *AFGE Local 1816 v. FLRA*, 715 F.2d 224, 228–29 (5th Cir.1983).

Neither opinion develops its theory very clearly. A possible reading is that the current employee has an interest under § 7115 in the actual dollars deducted from his wages, and that he is injured if those dollars are not transmitted to the union in fulfillment of his dues obligation. So framed, this theory would violate the employees' rights even though the union gave them full credit for the deduction.

This mechanical theory suffers two obvious drawbacks. First, there are, so far as appears, no specific dollars whose physical flow is interrupted in the way envisaged. The government agency does not put a lot of bills into a pot, representing deductions from specific workers' wages, and then pull some of those dollars back out to compensate itself for the illegal overpayments. More important, so long as the union gives the current employees full credit for the checked-off dues, those employees suffer no real-world injury whatsoever.

To find a meaningful injury for the current employees, it seems to me we must ask whether the government's conduct will cause them to lose credit for their allotment. In this litigation the union never represents that it will attempt to deny the current employees full credit for the amounts checked off from their wages, but I will, to give the theory the benefit of every doubt, assume that it might. The law of this circuit makes clear that the union would not be entitled to deny such credit. Accordingly, any credit denial will occur solely through the unjust and unlawful act of the union, not through the conduct of the government agency. Thus I can find no unfair labor practice in the conduct of the latter.

This court has held that where an employer has checked off the dues of an employee member pursuant to agreement with a union, and the employer has failed to deliver the funds to the union on the date due, the latter may not consider the members delinquent. *English v. Cunningham*, 269 F.2d 517, 539 (D.C.Cir.), *modified on other grounds*, 269 F.2d 539, *cert. de-*

*nied,* 361 U.S. 897, 905, 80 S.Ct. 195, 4 L.Ed.2d 152, 181 (1959). No reason is suggested why the check off should be treated differently just because it arises out of a statute.

While *English v. Cunningham* does not explain its result, it appears to reflect a view that once the wages are due and the union dues have been checked-off, it is as if the worker had paid the union, which had then deposited the funds with the employer as if the latter were its bank. Thus, the court reasoned that "the employer was the agent of the union" rather than of the employee. *Id.*[3] A case fitting this model is *Bassick Co. v. Bassick Local 229,* 126 F.Supp. 777, 779 (D.Conn.1953). There the court held that plaintiff company could attach, as an asset of the defendant union, monies it had checked off as dues but not yet paid over to the union.

An alternative view, less favorable to the government, is that the worker has delegated his duty to pay the union to the employing government agency. Such a delegation is permissible so long as the duty does not require personal performance, *see* 3 WILLISTON ON CONTRACTS § 411, at 20 (3d ed. 1960), and the worker's obligation is discharged so long as the employer performs it correctly, *id.* On this stricter view of the case, it would seem that the union could deny the worker credit if but only if the government's recoupment was improper under the law governing debtor-creditor relations between the government and the union.

The only legal authority on the subject offered by the parties or discovered by us (apart from the two recent AFGE opinions) holds that such recoupment is entirely permissible. In *Lodge 2424, Int'l Ass'n of Machinists, AFL–CIO v. United States,* 564 F.2d 66, 215 Ct.Cl. 125 (1977), a union sued the United States for $80.33 that the government had withheld under circumstances which almost exactly parallel those

involved here—recoupment from dues checked off for current employees to offset previous unlawful check-offs for an employee promoted out of the bargaining unit. The only difference between the cases is that in *Lodge 2424* the restriction on check-off arose out of a bargaining agreement and Civil Service Commission regulations, rather than out of § 7115 (which was not enacted until 1978). Denying the union recovery and upholding the government's recoupment, the court stated: "Few principles are so well established as the right of the Government to recover by offset or otherwise sums illegally or erroneously paid." *Id.* at 71 (citing *Wisconsin Central R.R. v. United States,* 164 U.S. 190, 211–12, 17 S.Ct. 45, 51–52, 41 L.Ed. 399 (1896); *United States v. Munsey Trust Co.,* 332 U.S. 234, 239–40, 67 S.Ct. 1599, 1601–02, 91 L.Ed. 2022 (1947) ("The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.' ")).[4]

In *Lodge 2424,* as here, the legal authority that disallowed a check-off for a promoted employee did not address the question of how to remedy such an improper check-off once it was made. The court inferred the government's power to recoup from the combination of the check-off restrictions and prevailing law as to the United States's ability to protect itself. AFGE notes that *Lodge 2424* was not based on a statute, but says nothing to suggest why that should make a difference.

Nor does the presence in *Lodge 2424* of an Army regulation authorizing correction, 564 F.2d at 71, adequately distinguish the case. First, if the collective bargaining agreement there disabled the government from recoupment, it is unclear why a regulation issued by one party (the Army) could abrogate that right. Second, the court made quite clear that its holding was independent of the regulation. After the pas-

<hr>

3. This characterization seems to fit *English* better than our case, given that there the automatic check-off was provided for by an agreement between the union and the employer, instead of by a statute as in this case.

4. AFGE cites 31 U.S.C. § 628 (1970) as barring recoupment by the United States in this situation. That section appears on its face to have no bearing at all on the present case, and in any event has not survived into the 1982 Code.

sage quoted above invoking the government's general right to recover by offset sums erroneously paid, the court concluded:

> Therefore, the means which the government took to recover the illegal payment were not only authorized by the regulations but sanctioned by these well settled rules of law.

*Id.* The court today, for no apparent reason, discards these well settled rules.

Thus under either characterization of the transaction, the union is not free to deny the current workers full credit for the amounts checked off, despite the government's recouping prior illegal payments. Under the *English v. Cunningham/Bassick* view, the check-off constitutes full payment, and that is the end of the matter. Under the delegated-duty view, the employee's entitlement to credit is contingent upon the government agency's following through correctly, but its decision to recoup is quite consistent with correct follow-through. To uphold the Authority here, we need not choose between these views.

In sum, Congress in § 7115 entitled employees in an appropriate bargaining unit to have their dues payment automatically allotted to the union by their employer, and the agency's conduct here vindicated that right. Its recoupment of sums mistakenly paid in the past cannot entitle the union to deny employees credit for current check-offs. As the supposed violation of current employees' § 7115 rights is the sole basis articulated by AFGE for its unfair labor practice claim, the absence of a violation defeats its contention.

The majority surprisingly suggests that the agency's attempted recoupment would "compound the error" of the initial overpayment. Maj.Op. at 1462. To the contrary, quite plainly the recoupment *corrects* the initial error. The court's decision, by contrast, disables the government agency from making the correction and confers on the union a wholly unintended windfall (use of government check-off to collect the dues of persons no longer unit members). Perhaps even more surprising, it assumes that if the government were allowed to

recoup overpayments to the union, the latter could deny current members credit for dues withheld from their pay and allocated to the union.

As the above suggests, there seems to me little doubt that the agency's conduct did not constitute an unfair labor practice. Were there any doubt, I believe that we would have to defer to the decision of the Federal Labor Relations Authority. As we recently observed,

> 'Congress has entrusted to the FLRA primary responsibility for administering and enforcing the Federal Service Labor–Management Relations Act. An FLRA interpretation of the Act, if reasonable and coherent, commands our respect.... As a court of review ... we are not positioned to choose from plausible readings the interpretation we think best. Rather, our task is to inquire whether the FLRA's reading is sufficiently plausible and reasonable to stand as the governing law, absent alteration by Congress.'

*AFGE v. FLRA,* 778 F.2d 850, 856 (D.C.Cir. 1985) (quoting *AFGE, Locals 225, 1504, and 3723, AFL–CIO v. FLRA,* 712 F.2d 640, 643–44 (D.C.Cir.1983)). *See also NTEU v. FLRA,* 826 F.2d 114, 120–21 (D.C.Cir.1987). Even if we read § 7115 not to expressly approve the position adopted by the agency and the Authority, we would be required to uphold it as a reasonable statutory interpretation under *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

I believe the petition for review should be dismissed.